# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Keith R. Jeffers,**
**Petitioner Below, Petitioner**

**FILED**

**November 15, 2019**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs)   No. 18-0510** (Kanawha County 17-P-84)

**Donnie Ames, Superintendent,**
**Mt. Olive Correctional Complex,**
**Respondent Below, Respondent**

## MEMORANDUM DECISION

Petitioner Keith R. Jeffers, pro se, appeals the May 14, 2018, order of the Circuit Court of Kanawha County denying his petition for a writ of habeas corpus. Respondent Donnie Ames, Superintendent, Mt. Olive Correctional Complex,[1] by counsel Scott E. Johnson, filed a response in support of the circuit court's order. Petitioner filed a reply.

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's orders is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner was convicted on January 28, 2008, of three counts of first-degree murder, one count of attempted first-degree murder, one count of attempted second-degree murder, two counts of malicious assault, and one count of burglary. With regard to the murder convictions, the jury did not recommend mercy. Accordingly, the circuit court sentenced petitioner to three life terms of incarceration without the possibility of parole and imposed the statutory maximum sentence for

---

[1]Since the filing of the appeal in this case, the superintendent at Mt. Olive Correctional Complex has changed and the superintendent is now Donnie Ames. The Court has made the necessary substitution of parties pursuant to Rule 41(c) of the West Virginia Rules of Appellate Procedure. Additionally, effective July 1, 2018, the positions formerly designated as "wardens" are now designated "superintendents." *See* W. Va. Code § 15A-5-3.

1

each of the other counts. The circuit court ordered that petitioner serve his sentences consecutively. Petitioner sought review of his convictions, but this Court refused his appeal on June 3, 2009. The Supreme Court of the United States denied certiorari. *See Jeffers v. West Virginia*, 559 U.S. 1092 (2010).

On May 26, 2010, petitioner filed his first petition for a writ of habeas corpus, alleging four grounds of relief: (1) that a number of jurors were dismissed by the circuit court and the attorneys in advance of trial without petitioner's knowledge and without him being present; (2) that the circuit court erred in instructing the jury with regard to evidence of flight; (3) that the circuit court erred in failing to grant a continuance to permit the defense to locate a witness; and (4) that the circuit court erred in making various evidentiary rulings at trial. By order entered June 11, 2010, the circuit court denied habeas relief without a hearing, finding that the allegations regarding the dismissal of the jurors were untrue and that the other grounds lacked merit based upon the record before the court. Petitioner did not appeal the denial of his first habeas petition.

On October 22, 2010, petitioner filed his second habeas petition, alleging a total of seven grounds for relief. The first four grounds were the same four grounds that petitioner previously raised in his first habeas proceeding. However, the final three grounds set forth in the second habeas petition were new: (1) that the circuit court improperly interfered with the underlying criminal case against petitioner; (2) that the prosecutor engaged in misconduct; and (3) that petitioner's trial counsel provided ineffective assistance. On October 25, 2010, the circuit court denied petitioner's second habeas petition without a hearing. Petitioner appealed the circuit court's October 25, 2010, order in *Jeffers v. Ballard* ("*Jeffers I*"), No. 11-0433, 2012 WL 3031055 (W. Va. Mar. 12, 2012) (memorandum decision). This Court affirmed the denial of petitioner's second habeas petition.

On February 15, 2017, petitioner filed a third habeas petition, alleging five grounds of relief: (1) that petitioner's trial counsel provided ineffective assistance; (2) that the prosecutor elicited false testimony from an expert witness; (3) that the two surviving victims misidentified petitioner as the shooter through overly suggestive photo arrays; (4) that insufficient evidence supported petitioner's convictions; and (5) that petitioner was denied due process at his trial because of the cumulative effect of various errors. The circuit court first denied the petition by order entered May 9, 2017, finding that, based on a review of the record, "[petitioner's] contentions of fact and law fail to adequately support his grounds for extraordinary post-conviction relief."

Petitioner appealed the circuit court's May 9, 2017, order in *Jeffers v. Terry* ("*Jeffers II*"), No. 17-0490, 2018 WL 1444292 (W. Va. Mar. 23, 2018) (memorandum decision).[2] In *Jeffers II*, this Court affirmed the denial of the third habeas petition as to all grounds except for ineffective assistance of counsel. With regard to that claim, we reversed the May 9, 2017, order and remanded the case to the circuit court "for specific findings of fact and conclusions of law as to whether

---

[2]We take judicial notice of the record in *Jeffers II*.

2

petitioner's ineffective assistance claim fails under the applicable *Strickland/Miller* standard." *Id.* at *3.[3]

Following remand, the circuit court entered a comprehensive order on May 14, 2018, setting forth specific findings of fact and conclusions of law showing that petitioner's ineffective assistance claim was without merit. In finding that petitioner was not entitled to habeas relief, the court specifically determined that there was no need to hold a hearing or appoint habeas counsel.

It is from the circuit court's May 14, 2018, order denying his third habeas petition that petitioner now appeals. In Syllabus Points 1 and 3 of *Anstey v. Ballard*, 237 W. Va. 411, 787 S.E.2d 864 (2016), we held:

> 1.      "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syl. Pt. 1, *Mathena v. Haines*, 219 W. Va. 417, 633 S.E.2d 771 (2006).

> . . . .

> 3.      "'A court having jurisdiction over habeas corpus proceedings may deny a petition for a writ of habeas corpus without a hearing and without appointing counsel for the petitioner if the petition, exhibits, affidavits or other documentary evidence filed therewith show to such court's satisfaction that the petitioner is entitled to no relief.' Syllabus Point 1, *Perdue v. Coiner*, 156 W. Va. 467, 194 S.E.2d 657 (1973)." Syl. Pt. 2, *White v. Haines*, 215 W. Va. 698, 601 S.E.2d 18 (2004).

On appeal, petitioner argues that the circuit court erred in failing to hold a hearing and in failing to appoint counsel prior to finding that his ineffective assistance claim lacked merit. Respondent counters that the circuit court properly determined that the claim did not justify the holding of a hearing or appointment of habeas counsel and correctly denied petitioner's petition. We agree with respondent.

---

[3]In Syllabus Point 5 of *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995), we held:

> In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

In *Jeffers II*, we relied on our decision in *State ex rel. Watson v. Hill*, 200 W. Va. 201, 488 S.E.2d 476 (1997), in remanding the case for specific findings of fact and conclusions of law. In *Watson*, we directed the habeas court to hold a hearing on the petitioner's ineffective assistance claim. *Id.* at 205, 488 S.E.2d at 480. However, we further indicated that a hearing might not have been ordered if the habeas court had made findings adequate to show that the petitioner's claim would have failed under the *Strickland/Miller* standard, stating that "[i]f that was the court's reasoning, it should have been included in the order[.]" *Id.* at 204, 488 S.E.2d at 479.

Here, in accordance with our mandate from *Jeffers II*, the circuit court set forth findings in its May 14, 2018, order showing that petitioner's ineffective assistance claim fails under the *Strickland/Miller* standard. The circuit court further made the specific determination that there was no need to hold a hearing or appoint habeas counsel. Based on our review of the record, we concur with the circuit court's findings. Therefore, having reviewed the circuit court's May 14, 2018, "Final Order Denying and Dismissing Petition for Writ of Habeas Corpus," we hereby adopt and incorporate the circuit court's well-reasoned findings and conclusions, which we find address petitioner's assignments of error. The Clerk is directed to attach a copy of the May 14, 2018, order to this memorandum decision. Accordingly, we conclude that the circuit court properly denied petitioner's habeas petition.

For the foregoing reasons, we affirm the circuit court's May 14, 2018, order denying petitioner's third petition for a writ of habeas corpus.

Affirmed.

**ISSUED**: November 15, 2019

**CONCURRED IN BY**:

Chief Justice Elizabeth D. Walker
Justice Margaret L. Workman
Justice Tim Armstead
Justice Evan H. Jenkins
Justice John A. Hutchison

4

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**KEITH R. JEFFERS,**

*Petitioner,*

v.

The Honorable Tod J. Kaufman, Judge
Civil Action No. 17-P-84

**RALPH TERRY, ACTING WARDEN**
**MOUNT OLIVE CORRECTIONAL COMPLEX,**

*Respondent.*

## ORDER DENYING AND DISMISSING PETITION FOR WRIT OF HABEAS CORPUS

By memorandum decision filed March 28, 2018 (which became final by mandate thirty days later), the West Virginia Supreme Court of Appeals affirmed this Court's summary dismissal of all of petitioner's claims in his latest petition for writ of habeas corpus, but remanded the matter to this Court for specific findings of fact and conclusions of law as to petitioner's claim of ineffective assistance of counsel.

This Court has painstakingly reviewed the entire file from the underlying criminal conviction, including but not necessarily limited to hearing transcripts, trial transcripts, motions filed, orders filed and the petition for appeal filed on behalf of the petitioner after his conviction. Additionally, the Court has reviewed the petitions, orders and decisions from petitioner's previous filings in habeas corpus. Finally, the Court has reviewed, with particularity, the claims of ineffective assistance of counsel as pled in the pending petition along with the exhibits attached to that petition which purport to support petitioner's claims.

The Court has determined that trial counsel was reasonably effective, as will be demonstrated below in the findings of fact, conclusions of law and discussion. As to each instance

1

in which petitioner claims trial counsel was ineffective, this Court finds that trial counsel was not ineffective under the applicable *Strickland/Miller* standard. That is, either the actions of trial counsel were not objectively deficient or those actions did not affect the result of the proceeding or both. Additionally, some of petitioner's claims are mere recitation of grounds without any factual support. This Court has determined that there is no necessity to appoint counsel in this matter or to hold an evidentiary hearing.

Petitioner's specific claims of ineffective assistance of trial counsel are as follows: (a) Trial counsel was ineffective for failing to investigate others who had motive and could have committed the murders (including a "purported confession"); (b) trial counsel did not investigate a claim that witness Toni Pantoja threatened another, unnamed witness; (c) trial counsel did not investigate a threatening phone call to a prospective juror; (d) trial counsel did not explore relationships between the police officers and the deceased (stating that Detective Richard Ingram and Amanda Ingram shared a last name); (e) trial counsel was ineffective for only calling one witness (petitioner does not state who else should have been called or what they might have testified to); (f) trial counsel did not impeach witnesses and (g) counsel did not object to Detective Ingram's "false" and "irrelevant" testimony regarding .40 Smith and Wesson casings. Additionally, this Court must note that in support of his claims the petitioner has chosen to include only partial transcripts. The petitioner has also chosen to include statements in those transcripts in presumably his own handwriting. This Court has relied on the whole transcripts, minus the commentary in making its decision.

# I.

## STATEMENT OF THE CASE

As this Court's decision, in part, rests upon the overwhelming nature of the evidence against the petitioner, a detailed recitation of that evidence will be necessary in this statement of the case.

1. The petitioner was indicted for, and convicted of, the first-degree murders of Dennis Lovejoy, Amanda Ingram and Gregory Childress. He was convicted of attempted murder in the second degree of James Adkins, and also malicious assault of Mr. Adkins. The petitioner was convicted for attempted murder in the first degree of Jerry Allen, and also malicious assault of Mr. Allen. The petitioner was also indicted for and convicted of burglary. (Indictment 06-F-472; Jury Verdict Form, 06-F-472.

2. Petitioner was appointed counsel who were active on his behalf pre-trial filing motions and challenging the state's evidence. Counsel moved for, and received discovery. Counsel moved for individual *voir dire*. Counsel moved to dismiss a count of burglary; to exclude mention of race from the trial; to preclude any mention of the petitioner's street name "Little"; to exclude evidence of motive; to bifurcate; for additional peremptory challenges; to allow a jury questionnaire; and brought to the Court's attention motions drafted by the petitioner. (File, 06-F-472.)

3. Counsel filed additional motions to exclude evidence of drug use and related evidence; to preclude explanatory answers on cross; to preclude speculative or conclusory statements; to limit evidence of flight; to exclude any reference to petitioner's previous criminal convictions and arrests; moved to have the petitioner evaluated for competency and any mental defense; and various motions in limine to bar hearsay evidence. (Id.)

3

4. Heard before trial was evidence on a motion to suppress out of court identifications made by two of the state's witnesses from a photo array. (Pre-trial Hearing Transcript, January 17, 2008 at 12.) Those witnesses were Jerry Allen and James Adkins. Sean Snuffer of the Kanawha County Sheriff's Department had prepared those lineups. (Id. at 13.)

5. Detective Snuffer prepared a photo lineup which included the petitioner and five other males who matched or resembled him. (Id. at 14.) The array was shown to James Adkins who was hospitalized. Mr. Adkins felt he knew who had shot him. The array was shown to Adkins. He was told to identify anyone he knew, but also told the person who shot him may or may not be in the array. (Id at 15.) Detective Snuffer read directions to Adkins which were printed on a form or on the array itself. Other than those directions, Detective Snuffer told the witness nothing else. (Id. at 16.) Adkins pointed out Number 6 and said that was the person who did the shooting. "And he also shot me in the stomach." Adkins identified the petitioner and signed the array, identifying photo 6 as "Little." (Id.)

6. Detective Snuffer prepared another array and showed it to Jerry Allen, who was also hospitalized. (Id. at 19.) The same procedure was used as was used with witness Adkins. Witness Adkins identified photo number 3 as the person who shot him, identifying number 3 as "Little." (Id. at 20.)

7. Witness Adkins knew the petitioner prior to the shooting. (Id. at 22.) Mr. Allen also knew the petitioner before he was shot. (Id. at 23.)

8. Trial counsel did inquire if any of the pictures were of "Dread". Detective Snuffer did not know because identifiers are not attached to the photos for the array. (Id. at 24.) Dread was identified by counsel as having been at the scene. (Id.)

4

9. Although both witnesses had been acquainted with the petitioner before the shooting, the witnesses were shown a photo array to confirm, if possible, that Keith Jeffers was the individual they knew as "Little." (Id. at 27.) There were no other individuals involved in the investigation who were known as "Little." (Id.) Ultimately, the Court ruled that the witnesses would be permitted to identify the petitioner in court.

10. Ms. Blake received an upsetting phone call and reported it to the clerk. (Trial Transcript, January 21, 2008 at 31.) The Court and counsel agreed to question her about the matter. (Id. at 32.) Ms. Blake had received a phone call on her cell phone on her way to Court that morning. The cell phone is not in her name, but in her employer's name. (Id.) A man represented himself to be an "officer" and that Ms. Blake had driven away a Silver Durango from a restaurant on Saturday night and that the three people she was with had "jumped" the caller. (Id. at 35-36.)

11. Ms. Blake does not own a silver Durango. The person to whom she was talking started yelling at her. (Id. at 36.) Ms. Blake told the Court that there is another Leah Blake who lives in St. Albans who was arrested for meth. (Id. at 37.) Ms. Blake was worried about her safety, believing that she had put that phone number on her jury questionnaire. The number was not on that questionnaire. (Id. at 37-38.) The person had given Ms. Blake a name, but she did not remember the name. (Id. at 40.) Upon inquiry, Ms. Blake had no problems remaining as a potential juror. (Id. at 41.)

12. Deputy Duff was employed by the Kanawha County Sheriff's Department. (Id. at 250.) On June 6, 2006, he was dispatched to a shooting in the Amandaville area. (Id. at 251.) He was dispatched to an address at 111 Mary Street, which is beside 401 Riverside. (Id at 252.) Deputy Duff met a man he knew as "Juice." Juice was walking toward the deputy from the Riverside residence. He was holding his stomach and bleeding from his stomach. (Id. at 253.)

5

13. Juice answered in the affirmative when the Deputy asked him if he had been shot. (Id.) Juice told the Deputy that he had been shot by "Little". When pressed for a name, Juice told the Deputy "Keith." (Id. at 254.)

14. Deputy Duff saw "Nook" face down on the ground with obvious wounds to his back and his left. (Id.) He'd been shot along with Juice. (Id.)

15. Nook was drifting in and out of consciousness and couldn't give a name of who shot him. But he said they'd driven off in a small white car. (Id. at 255.)

16. The paramedics told the Deputy there were three dead people in the house. (Id.). When he entered the house, Deputy Duff saw the dead victims and saw a bullet shell casing in the floor. (Id at 256.) Deputy Duff recognized the female victim, Amanda Walker, and one of the male victims, Dennis Lovejoy. (Id.)

17. When Deputy Duff walked to the back bedroom, he saw that the whole window and frame were lying in the front yard, and it was obvious someone had leapt from the window. (Id. at 257.)

18. On cross examination, defense counsel noted that he had a report from Sergeant Elkins that Vincent White had been paid money to deliver a message to a Michael Thompson and is associates. The message was from "Drey" or "Key". The message was, essentially to pay up or else. (Id. at 271-272.)

29. Dr. Umstot treated James Adkins on June 6, 2006. (Id. at 289.) He also treated the other gun-shot wound victim, Jerry Allen. (Id. at 290.)

30. He operated on James Adkins for a gunshot wound traversing the abdomen. The wound extended from under the left side of the rib cage through the belly button area towards the

6

general area of the appendix. (Id. at 292.) Mr. Adkins was positive for cocaine and THC upon admission. (Id. at 294.)

31. Dr. Umstot noted that Mr. Allen had a gunshot wound to his left arm, a couple to his buttocks and one in his lower abdomen. (Id. at 296.) Mr. Allen needed further surgery to correct internal bleeding. (Id. at 297.) Mr. Allen also was positive for cocaine and THC. (Id. at 299.)

32. Richard Ingram was the crime scene technician from the Kanawha County Sheriff's Department. (Id. at 318.) Officer Ingram responded to the scene, which had been secured by other officers. The house was a one-story residence. One enters into a living room. To the front and right of the living room is a kitchen. To the left, down the hallway would be living quarters. (Id. ad 321.)

33. Officer Ingram saw bullet casings in front of the couch in the living, and a couple of other places. (Id. at 322.)

34. In the dining room were three bodies, close to one another. (Id.)

35. In the dining room were bullets, casings and fragments from bullets. (Id. at 324.)

36. There were bullet holes in the wall. (Id. at 325.)

37. Two of the three bullets which had passed through the wall were found in the yard. (Id.) Mr. Ingram observed that to the far-left side of the residence a glass had been broken out where a person apparently jumped through it. Another window, almost exactly opposite, had also been knocked out by someone jumping through it. (Id. at 326.) Defense counsel objected to the speculation regarding people going through the windows, which was sustained. (Id. at 327.) The glass, however, was broken from the inside. (Id. at 328.)

38. Mr. Ingram defined for the jury that casings are the brass part that holds the bullet and the powder. The casings found were Smith & Wesson .40 caliber. (Id. at 338.)

7

39. A fired bullet was recovered from behind the stove in the kitchen. (Id. at 339.) The casings found in the living room were the same caliber. The import of that means the same type of weapon was used. (Id. at 343.)

38. The shooter used a semi-automatic weapon, .40 caliber. As one shoots the gun, the bullet goes out the barrel, the casing is automatically ejected to the side and another round goes into the chamber. Every time one shoots, a casing is ejected. (Id. at 344.)

39. Everything at the crime scene indicated that there was almost no movement at the time of the shooting and that the bodies were where they fell at the time of their deaths. (Id. at 345.)

40. A crack pipe was found outside the residence and a crack pipe and lighter were recovered from Ms. Ingram's hands. (Id. at 346.)

41. There was no evidence of a confrontation in the house. (Id. at 347.)

42. Mr. Ingram collected a .40 caliber Smith and Wesson casing from the living room which was later sent for analysis at the State Police lab. (Id. at 362-363.) Another .40 caliber Smith and Wesson casing from the living room was also collected and sent to the lab for analysis. (Id. at 364.) Another Smith and Wesson .40 caliber casing was found in the living room and sent to the lab for analysis. (Id. at 365.) Another casing, also Smith and Wesson .40 caliber was recovered from the living room, near the television, and sent to the lab for analysis. (Id. at 366.) Another casing, Smith and Wesson .40 caliber was found near the right shoulder of Mr. Lovejoy. That casing was also analyzed by the state police lab. (Id. at 367.) Another Smith and Wesson .40 caliber casing was recovered from underneath Mr. Lovejoy's body. (Id. at 368.)

43. Additional .40 caliber Smith and Wesson casings were recovered from the kitchen and dining area (id. at 369), a bucket in the dining area (id. at 370), a trash can in the dining area (id.

8

at 371), from a stand and from a cup in the trash can. (Id.) All were .40 caliber Smith and Wesson casings and all were submitted to the state police lab for analysis. (Id. at 372.)

44. Bullets were recovered from Jerry Allen (id. at 373), Dennis Lovejoy (id. at 374), the rear of the residence in the yard (id. at 375), another bullet from the yard (id. at 376), another bullet from the inside of the front door (id. at 377), another bullet from behind the stove (id. at 378), a bullet fragment from the kitchen (id.), a copper jacket from the kitchen (id.), and another bullet fragment from the kitchen (id. at 379). All those were sent to the state police lab for analysis. (Id.)

45. A bullet fragment was recovered from the head of Ms. Ingram at autopsy. (Id. at 380.) A fragment was recovered from Mr. Childress' neck. (Id.) Another bullet and fragments were recovered from Mr. Childress. (Id. at 381.) A bullet was recovered from Mr. Lovejoy's chest. (Id.) Those items were sent to the state police lab for analysis. (Id.)

46. A fired bullet from the kitchen, found near Mr. Lovejoy's shoulder was recovered and sent to the lab for analysis. (Id. at 382-383.)

47. Photographs were identified by Mr. Ingram of the front of the residence which showed a window covered up and bullet holes near the door which were not there on June 6, 2006, the day of the murders. (Id. at 385.) Those bullet holes were made sometime after the examination of the crime scene. (Id. at 386.)

48. Once Mr. Ingram became aware that Keith Jeffers had been identified as a suspect, he was entered into NCIC. (Id. at 388.)

49. After Jeffers was arrested in Pennsylvania, Mr. Ingram went to process the vehicle he was in at the time of his arrest. (Id. at 389.)

9

50. It was brought to the Court's attention that a Ms. Pantoja was apparently seen threatening another unnamed witness. (Id. at 404.) The Court noted additionally that there had been many younger adults in the courtroom that had been disruptive. (Id. at 405.)

51. Defense counsel noted that Ms. Pantoja had been subpoenaed by both the state and defense and that she had confronted counsel and told them she would not testify. (Id.) The defense had not decided whether to release her, and thus, she was barred from the courtroom. Ms. Pantoja insisted on coming in the courtroom, and when she was told she could not, she left. (Id. at 406.)

52. Trooper Chewning testified out of sequence so he could return to Pennsylvania. Around 10:00 p.m. on June 6, 2006 (several hours after the murders), he received a call that there was a disabled vehicle on Interstate 81, just north of Harrisburg. (Id. at 420.) The driver of the vehicle was Carrie Pauley. (Id. at 422.) When the registration on the vehicle was checked, it was listed as a "homicide" vehicle out of Kanawha County. What that meant was that the vehicle was registered to a murder suspect. (Id.)

53. Keith Jeffers was one of two men in the back seat of the vehicle and he was taken into custody by Trooper Chewning. (Id. at 424.)

54. Without specific citation, the Court will note that a portion of the cross-examination of Mr. Ingram was based upon what the police did not do. Fingerprints were not taken from the doorknob or from the shell casings until recently before trial. (Id. at 426-428.) No fingerprints were found. Although pressed by defense counsel, Mr. Ingram did not opine where the shooter had to be standing in the house. (Id. at 432-435.)

55. The front door of the residence was not forced. (Id. at 456.) Defense counsel pointed out that the cartridge and bullets don't identify any individual. (Id. at 461.)

10

56. Although defense counsel cross-examined about guns found in a locked room at the house, there was nothing disturbed in that room. It was immaculate and had no bullet holes. (Id. at 463.) Shell casings are not necessarily a good source of fingerprints because heat destroys fingerprints. (Id.) It's very rare to find identifiable prints on a casing. The blood samples were not submitted for DNA because the police knew the identity of the victims. (Id. at 464.) Detective Ingram clarified that bullet holes were found on the interior and near the front door during his examination; those were distinct from the bullet holes that were later found and not at the crime scene immediately after the murders. (Id. at 464-468.)

57. As to not examining footprints found in the blood, Detective Ingram noted that the paramedics had to step in the blood to reach the victims. (Id. at 471.) There was so much blood on the floor that it was difficult to move and that anyone who was in the kitchen tracked through blood. (Id. at 472.)

58. Detective Ingram did not believe either the door or the door handle would have been the best surface for recovering fingerprints. (Id. at 476.)

59. The "incident" with Ms. Pantoja was investigated by the Court. She adamantly denied threatening anyone stating that she started to make a derogatory name, but did not. She apologized to the police officer. (Id. at 481-482.) She was instructed to stay out of the courtroom and to say nothing. (Id. at 483-484.) Ms. Pantoja stated she had not discussed the case, but had said hello to witnesses she knew. (Id. at 484.)

60. Detective Snuffer of the Sheriff's Department also responded to the homicide scene at about 4:02 a.m. on June 6, 2006. (Id. at 492.) He interviewed Jessica Shamblin. The information from Ms. Shamblin led the detective to start looking for Carrie Pauley in reference to her boyfriend, Keith Jeffers, also known as Little. (Id.)

11

61. Detective Snuffer went to a residence in Alum Creek looking for Jeffers and to check on Carrie Pauley. (Id. at 493.) Jeffers was a suspect in the murders. (Id.)

62. Carrie Pauley was at the residence in Alum Creek. (Id.) She had been in Amandaville earlier. (Id.) Ms. Pauley was not forthcoming with her boyfriend's name until after the police found a car title. (Id. at 496.) Ms. Pauley was informed that her boyfriend was a suspect in three homicides and that he had shot two other people. (Id. at 497.)

63. Detective Snuffer had prepared the photo arrays shown to the surviving victims, Adkins and Allen. (Id. at 498.)

64. He prepared the array including the petitioner's photograph and other pictures that resembled him as much as possible. (Id. at 499.) The array was shown to James Adkins at CAMC where he was being treated. (Id.) Mr. Adkins was informed that the suspect might or might not be in the lineup. Detective Snuffer did not suggest to Mr. Adkins that he pick out anyone from the lineup. (Id. at 500.)

65. Mr. Adkins picked out photograph number 6 as the person who shot him. That photograph was of Jeffers. (Id. at 501.) Mr. Adkins marked the photo array by writing ". . .number six is Little, the person responsible for the shooting." (Id.)

66. Detective Snuffer prepared another array for Mr. Allen. (Id.) The petitioner's photograph was not placed in the number 6 spot. The detective used similar looking individuals. (Id. at 502.)

67. The array was shown to Jerry Allen in the Intensive Care unit at CAMC. Detective Snuffer told Mr. Allen the person who shot him might or might not be in the array. Mr. Allen knew one of the other individuals in the array, but pointed to photograph 3 as the person who shot him. Photograph 3 was Jeffers. (Id. at 503.)

12

68. Both Allen and Adkins knew Keith Jeffers before they were shown the line-up. (Id. at 516.)

69. Jessica Shamblin admitted she was addicted to drugs on June 6, 2006. (Id. at 522.) She knew Carrie Pauley. She knew the petitioner, by his nickname Little. She knew "Juice" Adkins. She knew Jerry Allen as "Nook." She also knew Amanda Ingram, Dennis Lovejoy and Mr. Childress. (Id. at 522-523.)

70. On June 5, 2006, the evening before the murders, Ms. Shamblin met up with Carrie Pauley. (Id. at 523.) Ms. Shamblin was getting high at Kanawha Terrace Apartments. Also present were Carrie, "Dred" and Cierra. (Id. at 524.) Dred and Cierra were not smoking crack, everyone else was. Ms. Shamblin and Carrie left to go get powder cocaine. (Id. at 525.) They went in Carrie's car to Valley View Drive, the home of Reba Parsons. (Id. at 527.)

71. Ms. Shamblin went into a residence to buy cocaine. Carrie stayed in the car. Later, Ms. Shamblin got Carrie to come into the house because she (Carrie) had the money to purchase cocaine. Little, that is Keith Jeffers, came into the house and pulled a pistol on Ms. Shamblin telling her to get Carrie back to the apartments. (Id. at 528.) Jeffers was upset with Carrie. (Id. at 529.)

72. Carrie and Ms. Shamblin left, but went a friend's house to get more money. They didn't return to the apartments because they'd spent Dred's money on crack cocaine, not powder. (Id. at 529.)

73. At some point they ended up at Dennis Lovejoy's house. Present were Ms. Shamblin, Juice, Nook, Amanda, Chilly and Dennis. Everyone was outside, and then they all went in. Everyone was in the kitchen except for Carrie who was in the living room. (Id. at 530.)

13

74. At some point, Ms. Shamblin was in the kitchen beside the refrigerator. She heard a knock on the door. Little was at the house. Ms. Shamblin hid behind the door from Little because "I was afraid he was going to whoop my ass." (Id. at 532.)

75. Little was "hollering" asking who was in the house. Ms. Shamblin heard Amanda ask, "what's the matter, Little?" (Id.) Juice told Little someone was back in the bedroom asleep. Ms. Shamblin then heard shots. (Id. at 533.) She didn't see anyone get shot but heard shots and the last thing she heard was Dennis saying "Oh, my God." (Id.) She heard a shot after she heard Dennis. (Id. at 534.)

76. She told Amanda to get up and saw that Mr. Childress had been shot in the head. She saw blood all over Mr. Lovejoy's face. (Id. at 536.)

77. There were no guns there before Keith Jeffers came in. When Little told everyone to get in the kitchen, no one resisted. (Id. at 537.) Ms. Shamblin took nothing out of the house when she left, not money, drugs, or guns. (Id. at 538.) She heard no threats to Jeffers. She identified Jeffers as the person she saw at the residence on Valley View and heard at the murder scene. (Id.)

78. Ms. Shamblin admitted doing just about anything to get drugs including breaking the law and lying to the police. (Id. at 539.)

79. James Adkins knew "Little" before June 6, 2006, and identified the person he knew as Keith Jeffers in open court. (Id. at 557.) Mr. Adkins was at Lovejoy's residence on June 5 and June 6, 2006. (Id. at 558.) Mr. Adkins, whose nickname was Juice, was a good friend of Lovejoy's. (Id.) They smoked crack at Lovejoy's house. (Id.)

80. Adkins saw Carrie, Jessie and Nook on the porch. Lovejoy let all of them, Adkins, Nook, Carrie, Jessie, Amanda and Chilly into the house and into the kitchen where they were

14

cooking some cocaine. (Id. at 560.) They were going to smoke the cocaine. Adkins gave hits to Amanda, Dennis and Chilly. (Id. at 561.)

81. Carrie Pauley was in the living room; everyone else was in the kitchen. At some point, Adkins looked up and Little was standing there with a gun. (Id.) Adkins reiterated that Keith Jeffers was Little and that Little had a gun at the Lovejoy house. (Id. at 562.)

82. Adkins was standing by the microwave; Allen was sitting on a crate against the wall. Amanda Ingram was sitting beside the microwave in a chair. Dennis was sitting in the chair in front of Little. Mr. Childress was in a far corner in a chair. Shambling was standing beside Adkins. (Id.)

83. Little said, not in calm way, "Juice, who all in the house?" (Id. at 563.)

84. Little, the petitioner, recognized Juice. Juice said that there was nobody in the house, just the people there. Juice then opened the closet door to shield himself from getting shot. (Id.) Shamblin ran into the closet. Jeffers pulled Juice by his arm and shot Juice in his stomach. (Id. at 564.)

85. Juice saw Jeffers point the gun and shoot Amanda. Juice then ran and jumped through the bedroom window, headfirst, to get away. He then ran next door. (Id.)

86. Juice told the people next door that Little had shot him and killed Amanda. (Id. at 565.)

87. Juice had been smoking crack earlier but was not high at the time. The lights were on in the kitchen and he had no trouble seeing the person who shot him. That person was only a couple of feet away. Juice described the gun as black, with "like a red stripe" and as a big gun. (Id. at 565-566.)

88. Juice had not had problems with Little before and Little didn't explain why he was angry. (Id. at 566.)

15

89. No one in the house, besides Little, had a gun that night. (Id. at 566-567.) No one threated Little or made a move toward him. (Id. at 567.)

90. On cross-examination, Juice admitted using cocaine at the house before and would not relate the names of the persons from whom he got drugs. (Id. at 568.)

91. Juice admitted smoking a couple of small rocks earlier, mixed with marijuana. (Id. at 570.)

92. Juice admitted knowing "of" an individual named "Dred." (Id. at 572.)

93. He denied that anyone, including Nook, ever sat on the couch with a gun on his lap at Lovejoy's acting as a guard for the crack house. Juice did not see Nook with a gun that night and didn't know him to carry one. (Id. at 574.)

94. When Keith Jeffers came in the house, he told Carrie to get out. (Id. at 575.)

95. Counsel asked if Juice had pistol whipped 2 guys over an 8 ball. He was asked if he were present when someone threw rocks through a windshield over a drug deal. (Id. at 576.)

96. Counsel cross-examined Juice over prior inconsistent statements about how long and how well he knew Jeffers. (Id. at 577.)

97. He was asked about 2 guys from New York named Dred and Key, and did not know them. (Id. at 580.)

98. Juice acknowledged that some of the some of the women at Lovejoy's were prostitutes but denied selling or getting drugs from them. (Id. at 582.)

99. Counsel closely examined Juice about distance and angle of the shooter. (Id. at 584-586.)

100. Juice had never seen Jeffers with a gun before that night and Jeffers had never threatened him if he smoked with Carrie. (Id.)

16

101. Travis Saunders knew Keith Jeffers, also known as Little. (Id. at 602.) He identified Jeffers in the courtroom. (Id. at 603.) Saunders was friendly with Jeffers and from time to time gave him a ride in a white Cavalier. (Id.)

102. On June 6, 2006, Saunders picked Jeffers up at Kanawha Terrace. They went to a bar. While in the car, Jeffers was having phone conversations. He was arguing with his girlfriend. Jeffers confided (at times) in Saunders that he was having big problems with his girlfriend doing drugs while she was pregnant. (Id. at 605.)

103. Jeffers also suspected she might be playing around with Juice. (Id. at 606.)

104. Saunders took Jeffers to a residence, presumably the Valley View address. (Id. at 607.) Carrie Pauley was at that house. Saunders saw Jeffers talking to her on the porch. (Id. at 608.) She walked over the hill and Jeffers returned to Saunders' car. (Id.) Jeffers asked which way Pauley went; Saunders told him. (Id. at 608-609.)

105. Saunders took Jeffers to Go Mart and then to the house in Amandaville. (Id. at 609.)

106. Jeffers walked in the house, Saunders waited in the car for him to come out. (Id. at 610.)

107. Saunders heard a "pop." He saw a man run by. Carrie came out and got in her car. Little got in her car. (Id.)

108. The next day, Little called and wanted a ride to the West Side. When he dropped Little off, he saw Carrie with another girl and that girl's baby. (Id. at 612.)

109. On cross, counsel pointed out that Saunders had not seen Jeffers with a gun or drugs but that he'd seen Carrie with a small gun on a previous occasion and that she pointed it at Jeffers. (Id. at 616.)

17

110. Saunders heard more than one "pop". The person who ran by the car was not Jeffers, but a white guy. (Id. at 617-618.)

111. Jerry Allen knew Keith before June 6, 2006. (Id. at 642.) They had lived in the same apartment complex. (Id.)

112. Allen identified the Keith he knew as the defendant on trial, the petitioner, Keith Jeffers. (Id. at 643.)

113. In the early morning hours of June 6, 2006, Allen was at Lovejoy's house in Amandaville. (Id.) When he got there, Carrie was in the living room. Amanda was sitting by the microwave, Dennis sitting by the wall, and the other victim sitting on the other side of the table. Juice was at the oven and Jessica was standing by the refrigerator. (Id. at 645.)

114. Not much time elapsed and Mr. Allen heard someone say who else is in the house make them get up and come up front. (Id.)

115. The person who made those statements was Keith Jeffers. Jeffers was standing in the living room, holding a gun. Allen asked him if he were all right and what was going on. (Id. at 646.)

116. Allen turned to go back through the kitchen but heard shots. (Id.)

117. Allen tried to get into the closet where he saw Jessie go. He then ran to the back door, but couldn't get through it. Juice ran in front of him, down the hallway. Allen ran toward the living room. (Id. at 647.)

118. Allen heard gunshots and had seen a gun in Jeffers' hand. (Id. at 647-648.) As Allen was running away from Jeffers he felt a shot in his left arm and one in his back. He fell at the door. Allen crawled beside the house and then beside a truck hollering for help. Allen deposited a lighter and a stem as he crawled away. (Id. at 648.)

18

119. Allen had not smoked immediately prior to the shooting, but had smoked earlier that day. Juice had the crack and had given it to Amanda, Dennis, and "the other guy." (Id. at 649.)

120. Allen remembered Deputy Duff telling him not to go to sleep. Allen knew Duff from the streets, and Duff knew Allen as "Nook." (Id. at 650.) He didn't remember being asked any questions. (Id.)

121. Allen was shot in his lower back, left buttocks and in his arm. (Id.)

122. Allen admitted using drugs and having served time in federal prison for distribution. (Id. at 651.)

123. Although Allen described the lighting in the kitchen as dull, he had no problem seeing Jeffers and seeing the gun. (Id.)

124. No one else had a gun. No one shot at Jeffers. No one tried to do anything to do Jeffers. Allen had not had any problems with Jeffers before this night. They were friends. (Id. at 652.)

125. On cross-examination, counsel stressed Mr. Allen's previous felony conviction. (Id. at 654.)

126. Mr. Allen was cross-examined on the inconsistency of stating the shooter's name was Little in his statement to the police and yet, referring to him as Keith in the courtroom. Counsel also attempted to point out an inconsistency in the number of years Allen had known Jeffers. (Id. at 655-656.)

127. Counsel further explored those inconsistencies; Allen responded he did not remember what he had stated at the hospital. (Id. at 656.)

128. Although Allen denied using drugs at Lovejoy's, he stated that he had seen drugs at the house and that Juice had drugs at the house the night of the murders. (Id. at 657.)

19

129. Mr. Allen did know if someone regularly sat on the couch in the living with a gun while drug transactions were going on in the house. (Id. at 658.)

130. Mr. Allen was cross-examined on whether he had told Deputy Duff that he did not know who shot him. (Id. at 665.)

131. Allen was cross-examined about an inconsistent statement he had given to the police about Carrie being in the kitchen when his trial testimony was that she was in the living room. (Id. at 673.)

132. He was asked about an inconsistency between trial testimony that the gun was in Jeffers' hand or whether it was to his side. (Id. at 675.)

133. Allen admitted using cocaine and marijuana in June of 2006. (Id. at 676.)

134. On re-direct Allen reiterated that he knew who shot him because he was pointing the gun at everybody. No one else had a gun. Allen had been clean for fourteen months at the time of the trial. (Id. at 679.)

135. Carrie Pauley had a child with the petitioner. (Id. at 682.) Pauley stated that Jeffers had a nickname "Little." He was her boyfriend on June 6, 2006. (Id.)

136. Ms. Pauley did not want to testify and acknowledged that she had reached a plea agreement that the misdemeanor charges pending against her would be dismissed if she testified truthfully. (Id. at 683.)

137. Jeffers was angry with Ms. Pauley on June 6, 2006. He told her to go home from Reba Parsons' house. She didn't. She partied and smoked crack with Jessica Shamblin. (Id. at 683-684.)

138. After he told her to leave the Parsons' home, she and Jessica went running around and ended up at Lovejoy's house in Amandaville. (Id. at 684.)

20

139. When she and Jessica went into the Lovejoy home, Nook, Juice, Amanda and Dennis were there along with another white guy. She was in the living room; the others were in the kitchen. After a couple of minutes, Little came in with a gun in his hand. (Id. at 686.)

140. Little told the others to get into the kitchen. Ms. Pauley saw him raise the gun. She left, but heard shooting. (Id.) She ran to her cousin's house at Kanawha Terrace and then to her house in Alum Creek. (Id. at 687.)

141. The police came to her house in Alum Creek the next morning. She lied to them, and admitted she'd lied to the police several times. (Id.). Later that day Cierra (the cousin), Pauley, Keith and Dred started driving towards New York. (Id.)

142. Pauley was aware that Jeffers was wanted for murder. (Id. at 688.) Ms. Pauley identified the defendant on trial, the petitioner, as the man who came into Lovejoy's house armed with a gun and demanded people to get into the kitchen. (Id.)

143. Ms. Pauley could not remember if she had seen Jeffers shoot. In a statement to the police, she stated she did see the petitioner shoot the gun. (Id. at 689.)

144. When she got to Kanawha Terrace immediately after the shooting, Dred was there asleep. She tried to wake him up, but couldn't. (Id. at 690.)

145. Ms. Pauley stated that Jeffers might or might not have said "Am I going to have to kill somebody in front of you to get you to stop?". She simply did not remember. (Id. at 691.)

146. Ms. Pauley was high the night of the shooting, using Zantac and crack. She was four months pregnant. (Id. at 692.)

147. Ms. Pauley denied ever pulling a gun on the petitioner. (Id.)

21

148. Jeffers was screaming and yelling when he came in the door. She didn't know who let him in; she thought it was the white guy she didn't know. That guy went back to the kitchen after he let Jeffers in. (Id. at 694.)

149. Steve Maynard was helping Reba Parsons move on June 5 and June 6, 2006. (Id. at 697.) He had taken a load of stuff to the new house. When he returned to the old place, there were people around the house. One of them was Carrie and another was Jessica Shamblin. (Id. at 699.)

150. Little showed up. He was "aggravated" because his girlfriend was there. He was angry and upset with Jessica. (Id. at 700.) At some point Carrie and Little came into the living room where Maynard was. Little said to Carrie "What am I going to have to do for you to listen to me, am I going to have to kill somebody in front of you?". (Id. at 701.)

151. Maynard saw the petitioner with a pistol. It was black, semi-automatic and possibly a .40 caliber. (Id. at 702.)

152. Defense counsel pointed out an inconsistency between the police statement that Maynard said he was on a couch and the trial testimony that he was on a chair. (Id. at 708.)

153. Phillip Cochran was qualified as an expert witness in firearm and toolmark examinations. He was employed by the West Virginia State Police. (Id. at 715, 718.) In regard to this case, Mr. Cochran had received 14 .40 S&W fired cartridge cases, six fired bullets, four fired bullet jacket fragments, one fired bullet jacket fragment with a lead fragment, and two fired bullet cores. (Id. at 719-720.)

154. Mr. Cochran was asked to determine if the bullets, casings, fragments, and cores had been fired from the same firearm. No gun was submitted for comparison purposes. (Id. at 724.)

155. Mr. Cochran opined that eleven of the fired cartridge cases came from the same gun. (Id. at 727.) A bullet core has no evidentiary value. (Id. at 729.) The bullet removed from Jerry

22

Allen was a .40 caliber Smith and Wesson. The bullet removed from Lovejoy's body was also a .40 caliber Smith and Wesson. (Id. at 732-733.) A bullet recovered from the yard was a .40 caliber Smith and Wesson. (Id. at 733.) Bullets recovered from the kitchen and front door were .40 caliber. (733.) Mr. Cochran could not classify the bullet fragments; but all that he could classify were .40 caliber. (Id. at 733-737.) The six bullets and two bullet jackets came from the same weapon, whatever that weapon was. (Id. at 741.) It was a .40 caliber, but could have been manufactured by one of several companies. (Id.) All of the cartridge casings also came from the same weapon. (Id. at 742.)

156. Defense counsel challenged Mr. Cochran on his use of the firing pin only for analysis. Mr. Cochran agreed that had it been a smooth firing pin it's the least reliable; however, the firing pin in this case had unique defects that left unique impressions in the bottom of the impression. (Id. at 749-750.)

157. Dr. Sabet was qualified as an expert witness in the field of forensic pathology. (Id. at 760.) He performed the autopsies on Amanda Ingram, Dennis Lovejoy and Gregory Childress. (Id.)

158. Amanda Ingram was 31 when she was murdered. (Id.) Ms. Ingram had a gunshot wound to her head and one to her chest. (Id. at 761.) One entrance wound was to the back of head. (Id. at 763.) The bullet passed through the back of her head and exited from her right temple. (Id. at 764.) She was shot from more than two feet away. (Id. at 766.) As to the gunshot wound to her chest, there was an entrance on the left chest, which exited on her left back. (Id. at 762.) That shot was also from more than two feet away. (Id. at 768.) Ms. Ingram used cocaine one or two hours before she died. (Id.)

23

159. Dennis Lovejoy had a gunshot wound to his left upper arm which entered his chest and exited from his back. He had a gunshot wound to his chest; that bullet was recovered from Lovejoy's body. (Id. at 769.) The shots were from some distance away. (Id. at 771-772.) Mr. Lovejoy had used cocaine one to two hours before he died. (Id. at 773.)

160. Mr. Childress had an entrance wound on his left cheek which passed through his carotid artery and exited on the right side of his neck. (Id.) Mr. Childress had another gunshot wound on his right chest which was a reentrance wound. (Id. at 775.) There was another separate wound to his chest which exited his back. (Id. at 776.) Mr. Childress had also used cocaine approximately one to two hours before he died. (Id. at 777-778.)

161. All three died from gunshot wounds. (Id. at 778.)

162. The state rested. (Id. at 788.)

163. The defense had exhausted all possibilities in attempting to locate Vincent White who supposedly had been paid to carry a threat to the Lovejoy residence. (Id. at 805.) The state pointed out, however, that the threat was towards a Thompson who was not tied into the trial at all. (Id. at 806.) The police were completely unware if whether that information regarding a threat was reliable or not. The Court ruled that the defense would not be able to question the police about the alleged threat because it was hearsay and hearsay unrelated to the events and people involved in petitioner's trial. (Id. at 807.)

164. The defense was given information that "Dred" had supposedly admitted to being the shooter. That information came from the state, and the state had investigated the matter, including taking statements from witnesses. Of those witnesses, only one claimed to have actually spoken to "Dred." (Id. at 813.) That "Dred" was apparently a different "Dred" than defense knew of. (Although the Court will note that the witness who actually testified ending up identifying the

24

confessing "Dred" with the "Dred" who was discussed at trial. The Court will also note that it was impossible for the "Dred" who was discussed at trial to be the shooter as he was asleep miles away when the murders occurred.) Defense counsel asked for a continuance to explore the new "Dred" acknowledging that the information was that "Dred" was in South Carolina or Jamaica. (Id. at 815.) Counsel also acknowledged that "Dred" might not exist. Nonetheless in defense of his client he requested a substantial recess or a mistrial to follow up on that information. (Id.)

165. The state objected. The prosecutors offered to make the one witness to whom "Dred" allegedly spoke directly available to the defense. (Id.) The state indicated it would not necessarily object to testimony from that witness about "Dred's" statement regardless of the hearsay problems. (Id. at 816.) The state pointed out the impossibility of recessing a trial to go looking for someone when they didn't really know who or where he was. (Id.)

166. The only "Dred" of whom anyone had information was the "Dred" who was asleep at the time of the crime according to Carrie Pauley. (Id.)

167. The defense had reserved its opening statement. In opening, the defense stated that it would call a witness named Ferrero who would testify that at a party about a year previously she had a conversation with "Dred" and that "Dred" admitted he was the shooter. (Id. at 819.) Counsel pointed out that the witnesses who were drug users have a hard time with truth and with perception. (Id. at 824.) He pointed out that the forensic evidence from the state's witnesses did not implicate Jeffers specifically. (Id. at 827.) He pointed out that the witnesses such as Juice and Nook had trial testimony that was different from previous statements. (Id.) Defense counsel stressed that this was an incomplete investigation regarding fingerprints, tire castings, DNA analysis, gunshot residue results. (Id. at 830-831.)

25

168. Jessica Ferrero testified that she attended a party approximately a year before trial and after the shootings where she had a conversation with "Dred" whose name was Orlando Robertson. (Id. at 843.) Robertson said Little didn't do it; he did. (Id. at 844.)

169. She said she hadn't come forward because she was afraid. (Id. at 844.)

170. Ms. Ferrero admitted that she was a very good friend of Jeffers, that he was like a brother to her and had helped pay her mother's bills. (Id. at 845.) "Dred" was Jeffers' cousin. She stated that this "Dred" was the same person who was in the car with Jeffers and Carrie Pauley in Pennsylvania. (Id. at 846.)

171. Ms. Ferrero told the police that while at the party she was reading newspaper articles (apparently about the murder.) (Id.) The newspaper article was six months old at the time of the party. (Id. at 847.) She claimed to be afraid of "Dred" but had had three phone conversations with him about personal matter on the Friday before she testified (which was Monday.) (Id. at 848.) She had no explanation for why she had let her friend sit in jail for a year without telling anyone someone else had confessed to the shooting. (Id. at 849.)

172. The defense rested. (Id. at 851.)

173. As the petition assails trial counsel for deficiencies in cross-examination and failing to impeach and therefore discredit witnesses, the Court will repeat the instruction given to the jury, as it is instructive as to what the jury actually considers when determining credibility.

174. The Court instructed the jury on credibility:

> During your deliberations, you should carefully consider the testimony of each and every witness, and not disregard or overlook any testimony, witnesses or evidence. Now, in saying that you must consider all of the evidence, I do not mean that you must accept all of the evidence as true or accurate. You, as jurors, are the sole judges of the credibility of a witness and the weight of the evidence. The credibility of a witness means the truthfulness of the witness and the weight of the evidence means the extent to which you are or are not convinced of the evidence.

26

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause the jury to discredit such testimony. Two or more persons witnessing an incident may see or hear it differently; and innocent misrecollection, like failure of recollection, is not an uncommon experience. In weighing the effect of a discrepancy, always consider whether it pertains to a matter or importance or an unimportant detail and whether the discrepancy results from innocent error or intentional falsehood. (Id. at 904-905.)

175. Moreover, the jury was also instructed on the specific factors it should consider in determining credibility including memory or lack thereof, the interest of lack thereof in the outcome of the trial, the relationship of witnesses to parties or to each other, demeanor, opportunity or lack thereof and means of having knowledge of the matters, reasonableness of the testimony, apparent fairness or lack thereof, intelligence or lack thereof, bias or prejudice, contradictory statements and contradictory acts. (Id. at 906.)

176. In closing, the state first summarized the evidence. Jeffers entered the Lovejoy evidence with the intent to commit a crime. (Id. at 948.) Pauley stated he had a gun in his hand. Once inside, he ordered people to the kitchen or asked who else was there. (Id. at 949.) The petitioner did not act in self-defense. The victims were in a friend's house, and the petitioner had no right to shoot them. (Id. at 950.) Jeffers executed three people and shot two others. (Id. at 951.) The petitioner asked his girlfriend what it would take for her to listen, kill someone? (Id. at 953.) That statement was made about an hour before Jeffers shot 5 people in the house where Pauley was. He was armed when he made that statement to Pauley. Maynard thought the gun was a .40 or .45 (Id. at 954.)

177. Although he told her to go home, Pauley went to Lovejoy's. Travis drove him there. He pulled out his gun. (Id.) Pauley testified he went in the house with the gun. He ordered the

27

people into the kitchen to narrow the area. James Adkins and Jerry Allen survived only because they were standing. The others were sitting ducks. (Id. at 955-956.)

178. Shamblin survived because she hid. (Id. at 956.) Five people, Allen, Adkins, Shamblin and Pauley all put the petitioner in the house; Saunders drove him there. Allen, Adkins, and Pauley all testified that he had a gun. (Id. at 961.)

179. Again, in summary, Maynard testified that the petitioner asked Pauley what it would take to make her listen; to shoot someone before her. Maynard saw the petitioner pull out a large handgun. And where's the motive for Maynard to lie? (Id. at 962.) Jessica Shamblin testified that the petitioner pulled a gun on her at Parson's house. She and Pauley didn't go home, they went to Lovejoy's. Shamblin heard the petitioner's voice at Lovejoy's and he was mad. She tried to hide. Shamblin heard shots and heard Lovejoy say "Oh, my God" and heard more shots. She heard Amanda ask the petitioner "What's the matter, Little." (Id. at 964.)

180. Shamblin heard the shots. She saw the bodies. She knew they were dead. (Id.)

181. Carrie Pauley testified that Little, Jeffers her boyfriend ordered her to go home, which she did not. She wasn't at Lovejoy's long when the petitioner came in with a gun in the hand. She saw him raise the gun and she headed for the door. (Id. at 966-967.)

182. Saunders, the defendant's driver, was waiting outside. He heard pops, saw a guy running by his car, and saw Carrie running from the house with Jeffers following her. Jeffers and Carrie got into her car and left. (Id. at 967.)

183. Carrie testified that Dred was asleep at Kanawha Terrace when she got there immediately after the murders. Carrie admitted lying to the police. (968.)

184. Adkins knew the petitioner, knew him to speak to him, and had no history of trouble with him. (Id. at 968.) Adkins saw the petitioner with the gun. He tried to get behind the door,

and Jeffers grabbed him by the arm and shot him in the stomach. As he was getting up, he saw the petitioner shoot Amanda. Adkins ran away and drove through the window. (Id. at 969.)

185. Jerry Allen knew Jeffers. He had known him for years. At the house he saw Jeffers pointing a gun. He had no history of trouble with Jeffers. He ran when the shooting started and was shot in the back as he headed for the front door. (Id. at 970-974.)

186. The state pointed out that to acquit the petitioner, the jury had to believe the lay witnesses all came in and lied. (Id. at 979.)

187. Defense closing pointed out credibility issues with the state's witnesses. (Id. at 984.) Closing also pointed out the purported police failures in not inventorying the guns in the locked room, failing to dust for prints, failing to do DNA. (984-988.)

188. Counsel pointed out the failure to do tire castings. (Id. at 990.) He pointed out that none of the forensic evidence was tied directly to Jeffers. (Id. at 994.) He assailed the credibility of the witnesses including Shamblin's previous conviction and previous lies. (Id. at 995.) He assailed Juice as a convicted felon and drug user. (Id. at 996.) Counsel pointed out inconsistencies in the pre-trial statements of Nook and his trial testimony. (Id. at 998.) Those included the length of time he'd known the defendant and whether or not he'd seen television coverage of the crime. Counsel noted that Maynard was inconsistent about whether they were sitting in chairs or on a couch. (Id. at 999.)

189. In rebuttal, the state reiterated that Allen, Adkins, Pauley and Saunders all put the petitioner in the Lovejoy house with a gun. (Id. at 1005-1006.) The state pointed out the inconsistencies of Ferrero's story. (Id. at 1008-1009.) He also pointed out that Dred couldn't have committed the crime because he was asleep at Kanawha Terrace. (Id. at 1010.)

190. The petitioner was convicted on all counts. (Id. at 1032-1034.)

29

191. Neither side presented witnesses in the sentencing aspect of the bifurcated trial. Each side argued its position. The jury did not recommend mercy. (Id. at 1050.)

192. The petitioner was sentenced to the permissible statutory amounts, including life without mercy on each of the three counts of murder in the first degree. The Court ordered the sentences to be served consecutively. (Sentencing Hearing, March 25, 2008, at 22-23.)

193. Because the petitioner is assailing trial counsel for failing to investigate this matter, the Court has examined the defense counsel voucher filed by lead counsel in this matter. The voucher indicates that petitioner met with his client on numerous occasions. He spent hours preparing for trial. He hired, or at least had contact with, a private investigator. He met with the investigator. He reviewed notes of witness' interviews and interviewed potential witnesses. He prepared and reviewed a witness list. Trial counsel spent more than 90 hours preparing for trial. Trial counsel obtained witness statements from a number of defense witnesses. A paralegal from counsel's firm was also involved in the defense of the matter. That included reviewing state's discovery and supplemental discovery, review of state's motions, preparing a notebook for a new investigator, review of all investigative reports, reading witness interviews and statements, preparing summaries of statements, drafting motions, reviewing memoranda from the investigator regarding interviews of witnesses, review of medical records, review of newspaper articles. Further, the attorneys met regarding the investigator's findings and attempted to find additional witnesses. The investigator interviewed Toni Pantoja. The defense team interviewed Carrie Pauley. The defense prepared a witness list. Counsel met with the investigator on several occasions. The team investigated the relationship of the petitioner and various witnesses. Moreover, it appears as if 4, or 5, paralegals as well as trial counsel and an investigator (perhaps more than one investigator) spent massive amounts of time preparing petitioner's defense.

30

194. The petitioner filed a notice of appeal, and subsequently (represented by counsel other than trial counsel) filed a petition for appeal. with the West Virginia Supreme Court of Appeals.

195. The petitioner raised the following issues as error in his petition for appeal: jury selection in the petitioner's absence, erroneous admission of flight evidence, erroneous denial of a mistrial or recess in order for trial counsel to locate "Dred", erroneous exclusion of statements that others than the petitioner had motive for these offenses; erroneous rehabilitation of a state's witness by the Court; erroneous denial of the petitioner's motion for new trial following the discovery that two witnesses had worked as informants; improper re-sentencing of the petitioner; erroneous bolstering of credibility by the state; state's erroneous definition of reasonable doubt; erroneous claim by the prosecutors to represent the people and cumulative error. (Petition for Appeal.)

196. The West Virginia Supreme Court refused the petition for appeal by order entered June 3, 2009. A later petition for writ of certiorari to the United States Supreme Court was likewise refused by order entered April 26, 2010. (Mandate and Letter on file in the Circuit Clerk's Office.)

197. This Court believes that the post-conviction procedural history of this case is more than adequately presented in *Jeffers v. Terry,* Memorandum decision, West Virginia Supreme Court of Appeals, filed March 23, 2018, in 17-0490, 2018 W. Va. Lexis 220. (No Westlaw or West Virginia Report citation currently available.)

198. That decision notes that after his conviction both the West Virginia Supreme Court and the United States Supreme Court refused direct review. *Jeffers, supra,* at *2.

199. Petitioner filed his first petition for writ of habeas corpus on May 26, 2010, asserting that jurors were dismissed in his absence, that the jury was erroneously instructed as to flight, that the circuit court erred in refusing a continuance to locate a witness and that the court erred in

31

various evidentiary rulings. The circuit court denied relief without a hearing finding that the allegations regarding the dismissal of jurors were untrue and that the other grounds lacked merit based upon the record. The petitioner did not appeal that denial. *Jeffers, supra,* at \*3.

200. Petitioner filed a second petition. The first four grounds were the same as in the first petition. New grounds asserted were that the circuit court improperly interfered in the trial, that the prosecutor engaged in misconduct and that petitioner's trial counsel was ineffective. The circuit court denied that petition. On appeal, that decision was affirmed. *Jeffers, supra,* at \*3.

201. As to the instant petition, he Court determined that as to all other grounds, save ineffective assistance, the dismissal ordered by the trial court was correct. The Court noted that the habeas judge had presided at trial and that a judge who presided at trial is sufficiently familiar with the underlying proceedings to determine most habeas issues without a hearing. *Jeffers, supra,* at \*6-\*7.

202. The West Virginia Supreme Court remanded this matter for the circuit court to make specific findings of fact and conclusions of law regarding the ineffective assistance claim. *Jeffers, supra,* at \*7.

## II.

## CONCLUSIONS OF LAW AND DISCUSSION.

1. Jurisdiction and venue are appropriately in the Circuit Court of Kanawha County, pursuant to Rule 3 of the West Virginia Rules Governing Post-Conviction Habeas Corpus Proceedings in West Virginia.

2. West Virginia Code §53-4A-1 provides for post-conviction habeas relief for "[a]ny person convicted of a crime and incarcerated under sentence of imprisonment therefor who contends that there was such a denial or infringement of his rights as to render the conviction or

32

sentence void under the Constitution of the United States or the Constitution of this State or both. . '"

3. The contentions and the grounds in fact or law must "have not been previously and finally adjudicated or waived in the proceedings which resulted in the conviction and sentence, or in a proceeding or proceedings in a prior petition or petitions under the provisions of this article, or in any other proceeding or proceedings which the petitioner has instituted to secure relief from such conviction or sentence." West Virginia Code §53-4A-1.

4. "Whether in the first habeas corpus petition or a subsequent habeas corpus petition, habeas corpus allegations must have adequate factual support. 'A mere recitation of any of our enumerated grounds without detailed factual support does not justify the issuance of a writ, the appointment of counsel, and the holding of a hearing.' *Losh*, 166 W.Va. at 771, 277 S.E.2d at 612." *Markley v. Coleman*, 215 W. Va. 729, 734, 601 S.E.2d 49, 54 (2004).

5. The habeas corpus statute "contemplates the exercise of discretion by the court." *Perdue v. Coiner*, 156 W. Va. 467, 194 S.E.2d 657 (1973).

6. The circuit court denying or granting relief in a habeas corpus proceeding must make specific findings of fact and conclusions of law relating to each contention raised by the petitioner. *State ex rel. Watson v. Hill, 200* W. Va. 201, 488 S.E.2d 476 (1997).

7. "Habeas corpus proceedings are civil proceedings. The post-conviction habeas corpus procedure provided for by Chapter 85, Acts of the Legislature, Regular Session, 1967, is expressly stated therein to be 'civil in character and shall under no circumstances be regarded as criminal proceedings or a criminal case.'" *State ex rel. Harrison v. Coiner*, 154 W. Va. 467, 476, 176 S.E.2d677, 682 (1970). The burden is on the petitioner to prove his claims by a preponderance of the evidence.

33

8. "A habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed." Syl. Pt. 4, State *ex rel. McMannis v. Mohn*, 163 W. Va. 129, 254 S.E.2d 805 (1979). Moreover, "[t]he sole issue presented in a habeas corpus proceeding by a prisoner is whether he is restrained of his liberty by due process of law." Syl. Pt. 1, *State ex rel. Tune v. Thompson*, 151 W. Va. 282, 151 S.E.2d 732 (1966).

9. A circuit court having jurisdiction over habeas corpus proceedings has broad discretion in dealing with habeas corpus allegations. *Markley, supra* at 733, 601 S.E.2d at 53. It may deny the petition without a hearing and without appointing counsel if the petition, exhibits, affidavits and other documentary evidence show to the circuit court's satisfaction that the Petitioner is not entitled to relief. Syl. Pt. 3, *Markley, supra*. A circuit court may also find that the habeas corpus allegation has been previously waived or adjudicated and if so, the court "shall by order entered of record refuse to grant a writ and such refusal shall constitute a final judgment." *Markley, supra*, at 733, 601 S.E. 2d at 53 (2004) (citations omitted). (citing W.Va. Code section 53-4A-3(a)).

10. When determining whether to grant or deny relief, a circuit court is statutorily required to make specific findings of fact and conclusions of law relating to each contention advanced by the petitioner and to state the grounds upon which each matter was determined. Syl. Pt. 4, *Markley, supra*. *See also* W.Va. Code §53-4A-3(a).

11. Claims of ineffective assistance begin and in large measure end with the standards set forth in *Strickland/Miller*.

12. West Virginia evaluates an ineffective assistance of counsel claim under the two-prong standard set forth by the Supreme Court of the United States in *Strickland v. Washington*. Syl. Pt. 5, *State v. Miller*, 194 W. Va. 3, 459 S.E. 2d 114 (1995) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). To succeed on such a claim, a petitioner must establish that: 1) his trial counsel's

34

"performance was deficient under an objective standard of reasonableness; and 2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." (*Id.*) "Failure to meet the burden of proof imposed by either part of the *Strickland/Miller* test is fatal to a habeas petitioner's claim." *State ex rel. Vernatter v. Warden, W. Virginia Penitentiary*, 207 W. Va. 11, 528 S.E. 2d 207 (1999).

13. The *Strickland* standard is not easily satisfied. *See Miller*, 194 W. Va. at 16 ("[T]he cases in which a defendant may prevail on the ground of ineffective assistance of counsel are few and far between."), *State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 319, 465 S.E. 2d 416, 421 (1995)(ineffective assistance claims are "rarely" granted and only when a claim has "substantial merit"), *see also, Whiting v. Burt*, 395 F.3d 602, 617 (6th Cir. 2005)("Petitioners claiming ineffective assistance of counsel under *Strickland* have a heavy burden of proof.").

14. In *Miller*, the court outlined the challenge faced by a petitioner claiming ineffective assistance, noting that judicial review of a defense counsel's performance "must be highly deferential" and explaining that there is a strong presumption that "counsel's performance was reasonable and adequate." *Miller*, 194 W.Va. at 16, 459 S.E.2d at 127. Moreover, the *Miller* court held that there is a "wide range" of performance which qualifies as constitutionally-adequate assistance of counsel, stating:

> A defendant seeking to rebut th[e] strong presumption of effectiveness bears a difficult burden because constitutionally acceptable performance is not defined narrowly and encompasses a 'wide range.' The test of ineffectiveness has little or nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We only ask whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue

*Id., see also Vernatter*, 207 W. Va. at 17, 528 S.E.2d at 213 ("[T]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . .'") (quoting *Strickland*, 466 U.S. at 689).

35

15. A petitioner claiming ineffective assistance must identify the specific "acts or omissions" of his counsel believed to be "outside the broad range of professionally competent assistance." *See Miller*, 194 W. Va. at 17, 459 S.E.2d at 128, *State ex rel. Myers v. Painter*, 213 W. Va. 32, 35, 576 S.E.2d 277, 280 (2002)("The first prong of [the *Strickland*] test requires that a petitioner identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment)(internal quotation marks omitted).

16. The reviewing court is then tasked with determining, "in light of all the circumstances" but without "engaging in hindsight," if that conduct was so objectively unreasonable as to be constitutionally inadequate. *Miller*, 194 W. Va. at 17, 459 S.E.2d at 128.

17. Strategic choices and tactical decisions, with very limited exception, fall outside the scope of this inquiry and cannot be the basis of an ineffective assistance claim. *Legursky*, 195 W. Va. at 328, 465 S.E.2d at 430 ("A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness.")(internal quotation marks omitted), *Miller*, 194 W. Va. at 16, 459 S.E.2d at 127 ("What defense to carry to the jury, what witnesses to call, and what method of presentation to use is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.").

18. Identifying a mere mistake by defense counsel is not enough. *See Edwards v. United States*, 256 F.2d 707, 708 (D.C. Cir. 1958) ("Mere improvident strategy, bad tactics, mistake, carelessness or inexperience do not . . . amount to ineffective assistance of counsel, unless taken as a whole the trial was a 'mockery of justice.'"). As the *Miller* court noted, "with [the] luxury of time and the opportunity to focus resources on specific facts of a made record, [habeas counsel] inevitably will identify shortcomings in the performance of prior counsel;" however, the court

continued, "perfection is not the standard for ineffective assistance of counsel." *Miller*, 194 W. Va. at 17, 459 S.E.2d at 128.

19. Even if defense counsel's conduct is deemed objectively unreasonable, and therefore satisfies the first *Strickland* prong, that conduct does not constitute ineffective assistance unless the petitioner can also establish that the deficient conduct had such a significant impact that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syl. Pt. 5, *Miller, supra*. As the Supreme Court explained in *Strickland*, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Thus, satisfying *Strickland's* "prejudice prong" requires a showing that counsel's deficient performance was serious and impactful enough to "'deprive the defendant of a fair trial, a trial whose result is reliable.'" *State ex rel. Strogen v. Trent*, 196 W. Va. 148 at n. 4, 469 S.E.2d 7, 12 (1996) (quoting *Strickland*, 466 U.S. at 687), *see also Myers*, 213 W. Va. at 36, 576 S.E.2d at 281 (2002) ("The second or "prejudice" requirement of the *Strickland / Miller* test looks to whether counsel's deficient performance adversely affected the outcome in a given case.").

20. There is no precise formula, applicable in all cases, that can be applied to determine if the constitutionally-inadequate conduct in question so significantly degraded the reliability of the trial such that the prejudice prong is satisfied. *See Legursky*, 195 W. Va. at 325, 465 S.E.2d at 427 ("Assessments of prejudice are necessarily fact-intensive determinations peculiar to the circumstances of each case."). But there is no question that the burden of demonstrating prejudice lies with the petitioner. *Strickland*, 466 U.S. at 693, *Legursky*, 195 W. Va. at 319, 465 S.E.2d at 421.

37

21. The issue of ineffective assistance of counsel is the sole issue on remand. Therefore, none of the other issues raised in the petition will be addressed.

22. This Court will reiterate that it is judging the effectiveness of trial counsel under the applicable *Strickland/Miller* standard. The Court will evaluate whether the acts and omissions about which petitioner complains constitute objectively deficient performance. If the Court determines that any act or omission of counsel was objectively deficient, the Court will than analyze whether such deficiency affected the outcome of the proceeding. The Court repeats that failure of the petitioner to satisfy both prongs of the analysis defeats his claim of ineffective assistance.

23. The Court also notes that it will not engage in second guessing or hindsight. It presumes, as required by law, that counsel's performance was reasonably effective. The burden rests upon the petitioner to demonstrate that counsel's performance was ineffective. The Court will note that strategic decisions rarely can result in a determination that counsel was ineffective. Moreover, the burden is on the petitioner to plead his claim with particularity and to support that claim with evidence. That is, the petitioner must identify specific acts and omissions and support his claims with evidence. A mere recitation of grounds without factual support is inadequate.

24. The Court will address each of petitioner's assertions of ineffective assistance separately.

25. Petitioner states that trial counsel was ineffective in failing to adequately investigate the case in that he did not investigate any evidence regarding others who had motive or confessed to the murder.

26. The Court finds that this contention is belied by the trial record. Trial counsel investigated the alleged threat that an individual had paid someone $100.00 to deliver a threat.

38

Trial counsel had the information that Vincent White had been money to deliver a threat to Michael Thompson. (Transcript at 271-272.) The defense attempted to find White, but were unsuccessful. The defense received the information about Dred confessing to Ferrero during trial. The defense attempted to continue the case to find Dred, the Court refused such continuance.

27. The Court finds that the trial record and defense voucher reveal that defense counsel attempted to investigate and find others who had motive. Therefore, counsel was not objectively deficient for failing to investigate.

28. However, the Court also finds that even if trial counsel could have investigated more, no amount of investigation into others who had motive would have changed the result of this proceeding. That is, the defense could have found any number of individuals who would state that he or she disliked, had animus against, or even wanted to kill or hurt any one or more of the five victims and such testimony simply would not have affected the outcome of the trial.

29. The petitioner states in conclusory fashion that others had motive and were potential shooters. However, the petitioner fails to demonstrate how evidence about those others would have affected the jury verdict.

30. The jury heard about Dred's so-called confession in the Ferrero testimony and rightfully ignored that story which lacked credibility. Moreover, this Court believes that even if counsel had been able to find Dred and procured his testimony that Dred would not have confessed to the murders on the witness stand.

31. Dred would not have confessed because he didn't commit the murders. The jury found from overwhelming evidence that the petitioner did.

32. A synopsis of the evidence reveals that all of the identifiable bullets and casings from the scene and the victim's bodies came from the same weapon leading to the conclusion that only

39

one person shot and killed and wounded the victims. Steve Maynard was present when the petitioner pulled a gun and asked Carrie Pauley if he would have to shoot someone in front of her for her to learn a lesson. Carrie Pauley was pregnant with the petitioner's child and she refused to quit using drugs. Carrie Pauley testified that the petitioner told her to go home after she left the Parsons' home; she didn't but went to the Lovejoy residence. Jessica Shamblin testified that the petitioner pulled a gun at the Parsons' residence. Shamblin, Pauley, Allen and Adkins all knew petitioner. The record is bereft of any indication that any of those individuals had such animus against the petitioner that they would lie to have him convicted of murder.

Travis Saunders drove petitioner to the Lovejoy residence. No one else in the Lovejoy residence was armed. Shamblin saw the petitioner in the residence with a gun and heard shots. Pauley saw the gun in petitioner's hand and left hearing shots. Allen and Adkins, who survived, both testified that the petitioner was the one who shot them. Adkins testified he saw Jeffers murder Amanda. When the police told Pauley that Jeffers was wanted for murder, they fled.

Again, that is a short recitation of the overwhelming evidence. Suffice it to say, five individuals put Jeffers at the murder scene at the time of the murders. Four of those, including his own girlfriend, place the gun in his hands. Shamblin heard the murders; Allen and Adkins were eye-witnesses to their own wounding.

33. The Court believes that counsel's investigation of others with motive was adequate. And further, in the face of the mountain of evidence, any suggestion that another had motive would not have acquitted the petitioner. Petitioner fails to demonstrate that counsel was objectively deficient in failing to investigate the case. Moreover, he fails to show how this asserted deficiency affected the result of the proceeding. Petitioner fails to satisfy either prong of *Strickland/Miller*. This specific contention affords the petitioner no relief.

40

34. Petitioner states that trial counsel was ineffective in failing to investigate the harassment of another witness by Toni Pantoja. Petitioner does not state how this failure to investigate affected the result of the proceeding. Petitioner does not state how any failure to investigate the Pantoja "intimidation" affected the result of the proceeding.

35. The Court has examined this contention and believes that although petitioner tries to couch this as a specific omission and failure by defense counsel that it really is only a recitation of a ground without factual support.

36. The Court will note that when it was reported that there was an incident with Ms. Pantoja that she was questioned in chambers and adamantly denied engaging in any threatening or intimidating behavior.

37. In the face of the Court's questioning of Ms. Pantoja, the Court does not believe that there were any steps that counsel should have taken in order to investigate the matter further

38. Moreover, the Court fails to discern any prejudice whatsoever in counsel's failure to inquire further into Ms. Pantoja's behavior.

39. The petitioner does not even speculate, much less support with evidence, how Ms. Pantoja and her conversation, if any there was, with any witness or prospective witness affected the trial.

40. The Court finds this to be a non-issue. When the Pantoja situation was brought to the Court's attention, the Court inquired as to what had happened. Ms. Pantoja denied anything untoward and there is nothing of record to demonstrate that she was not truthful.

41. Moreover, even if Ms. Pantoja engaged in a confrontation with, or even threatened some unnamed person (even a trial witness) there is no evidence of record to support an inference that petitioner's trial was affected. Again, the evidence against the petitioner was overwhelming.

41

42. The Court finds that defense counsel handled the Pantoja situation appropriately, that there was nothing to investigate. Therefore, counsel's actions were reasonable and petitioner fails to satisfy the reasonably effective performance prong of *Strickland/Miller*. Moreover, petitioner equally fails to satisfy the prejudice prong of the ineffective assistance of counsel analysis. Petitioner does not demonstrate failure to inquire further of Ms. Pantoja or anyone else affected the jury verdict

43. Petitioner states that trial counsel did not investigate the threatening phone call made to Juror Blake.

44. The Court disagrees with petitioner's statement that Ms. Blake was threatened by a police officer. The call Ms. Blake received came from someone who *claimed* to be a police officer.

45. The phone call was thoroughly discussed in chambers by counsel, the Court and Ms. Blake.

46. The Court cannot discern that there were any other investigative steps counsel could have taken regarding such phone call. Moreover, if one assumes that Ms. Blake believed she had been threatened by a police officer, then the natural tendency would be for her to have ill feelings toward the police and not the petitioner.

47. Petitioner does not allege that the phone call affected Ms. Blake or made her biased against him.

48. Petitioner does not even speculate as to how the result of his trial would have differed if counsel had done anything more regarding the phone call.

49. Upon inquiry, Ms. Blake had no problem remaining on the jury. There is no suggestion that she was anything other than an impartial juror who followed her oath to listen to the evidence and well and truly try the case.

50. The petitioner has failed to satisfy either prong of *Strickland/Miller* regarding this non-issue. That is, he cannot show that reasonably objective counsel would have handled the matter any differently than trial counsel did; and equally fails to demonstrate that he was in any way prejudiced by counsel's actions or inactions regarding Juror Blake. This contention affords the petitioner no relief.

51. Petitioner states that trial counsel was ineffective in failing to investigate relationships between the investigators and the deceased. The only specific mentioned is that Amanda Ingram, a victim, and Richard Ingram, an investigator had the same last name. Moreover, petitioner separately claims that counsel did not effectively impeach Ingram regarding false and irrelevant findings.

52. The Court will note that Richard Ingram was the crime scene technician. He photographed the scene and collected evidence.

53. The Court will also note that Mr. Ingram's testimony did not tend to inculpate Jeffers, particularly. That is, Mr. Ingram testified as to what he found, where he found it and what it was. His testimony did not tie any of the items of physical evidence to Jeffers.

54. The Court believes that the last names were merely coincidental. The Court also notes that the petitioner believes that if a relationship existed then the "expert" witness could have been impeached. Mr. Ingram testified as a fact witness, not an expert, and gave no opinion that tied the physical evidence to Jeffers. Mr. Ingram's testimony, although important because it demonstrated

43

there was only one shooter did not tend to inculpate Jeffers as that shooter—as opposed to someone else.

55. The Court does not believe that an objectively reasonable practitioner would have explored a relationship between Mr. Ingram and a victim. The Court also does not believe that an investigation into that relationship would have affected the result at trial. Mr. Ingram's testimony simply was not inculpatory to Jeffers, particularly. Petitioner satisfies neither prong of *Strickland/Miller*. This contention affords the petitioner no relief.

56. Petitioner states that trial counsel was ineffective in not calling more witnesses.

57. Petitioner does not state who else should have been called, what they might have testified to, and how that would have affected the verdict at trial. The Court believes that this a recitation of a ground without supporting evidence which does not justify the appointment of counsel or holding a hearing. *Markley, supra.*

58. The petitioner does not even speculate as to how the testimony of any unnamed witness or witnesses would have affected the jury verdict. Not only is this a mere recitation of a ground subject to summary dismissal, petitioner fails utterly to satisfy either prong of *Strickland/Miller.*

59. Petitioner fails to demonstrate that there were witnesses that an objectively reasonable practitioner would have called; nor does he demonstrate that the jury verdict would have differed if those unnamed witnesses had been called. This contention affords the petitioner no relief.

60. Petitioner states that trial counsel was ineffective in not impeaching witnesses. He mentions specifically witness Allen as being inconsistent as to whether he knew Jeffers as Little or Keith. He mentions specifically witness Allen in being inconsistent as to whether he was at the Lovejoy house for five minutes or ten minutes before the shooting started. He mentions specifically witness Allen being inconsistent as to whether or walked or rode in a car to the Lovejoy

44

house. He mentions specifically an inconsistency from witness Adkins as to whether he knew Little only as Little or whether he knew him as Keith. He mentions specifically an inconsistency as how long Adkins had known Jeffers.

61. The Court will note that the petitioner is incorrect in stating that his counsel failed to identify some of the above inconsistencies.

62. Counsel did cross-examine witness Adkins to how long and how well he knew Jeffers. (Trial transcript at 577.) Allen was cross-examined as to the inconsistency as to how long he'd know Jeffers and whether he knew him as Keith or Little. (Id. at 655-656.)

63. Moreover, on cross Juice admitted smoking cocaine that evening. (Id. at 570.) He was also cross-examined about prior cocaine use (id. at 568), seeing a drug guard at the Lovejoy house, (id. at 574), pistol whipping others (id. at 576), and knowledge of prostitutes at the Lovejoy house.

64. Allen was cross-examined regarding a felony conviction (id. at 654), his use of drugs and drugs at the Lovejoy house (id. at 657), whether he had told Deputy Duff he didn't know who shot him (id. at 665), inconsistencies between his police statement about where Carrie was in the house and where he said she was at trial (id. at 673.), whether the gun was in Jeffers' hand or at his side (Id. at 675.)

66. The Court has examined the other particulars about supposedly inconsistent testimony from Allen regarding how he got to the Lovejoy residence and whether he was there five or ten minutes before the shooting started. The Court has also examined the particulars the petitioner raised as to the questioning of Adkins. The Court believes that counsel explored the inconsistencies petitioner raised as to witness Adkins. Assuming for the purpose of argument that petitioner is correct and that there were inconsistencies in between a prior statement of Allen and

45

trial testimony, which were not explored by counsel, the Court believes that those were innocent misrecollections which would have been discounted by the jury.

67. The questions asked on cross-examination are the epitome of strategic decisions. Strategic choices and tactical decisions, with very limited exception, fall outside the scope of this inquiry and cannot be the basis of an ineffective assistance claim. *Legursky*, 195 W. Va. at 328, 465 S.E.2d at 430 ("A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness.")(internal quotation marks omitted), *Miller*, 194 W. Va. at 16, 459 S.E.2d at 127 ("What defense to carry to the jury, what witnesses to call, and what method of presentation to use is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess."). Counsel effectively cross-examined both Adkins and Allen. They were impeached by inconsistent statements, a felony conviction, and drug usage. The questions submitted by petitioner that should have been asked were in large measure actually asked. Those that were not asked would not have impeached the witnesses and therefore not affected the result.

68. The petitioner satisfies neither prong of *Strickland/Miller*. This contention affords him no relief.

69. The Court has addressed the particulars pled by petitioner in support of his allegation of ineffective assistance of trial counsel and finds that none of them have merit.

70. The Court again stresses that the petitioner was identified by Adkins and Allen as the person who shot them. He was identified as being present at the murder scene with a gun by Pauley and Shamblin. None of the state's witnesses were identified as having any reason to lie to convict Jeffers, either singularly or in some elaborate conspiracy.

71. The petitioner received a fair trial with the effective assistance of counsel.

46

## III.

## CONCLUSION AND FINAL ORDER

THEREFORE, based upon a thorough and complete review of the complete contents of the criminal case file in this matter, and considering the arguments of counsel for the petitioner and the warden in written submissions, it is ORDERED that the petition seeking a writ of habeas corpus be and the same is hereby DENIED. It is further ORDERED that said civil action be and the same is hereby DISMISSED. The Court notes the exceptions and objections of the petitioner. It is ORDERED that the Office of the Circuit Clerk of Kanawha County send a certified copy of this ORDER to counsel of record and to the petitioner at Mount Olive Correctional Complex, One Mountainside Way, Mount Olive, WV, 25815.

Entered this 14th day of May, 2018.

_____

Tod J. Kaufman, Judge

The other grounds raised by petitioner regarding counsel in the previous process, including the trail, were affirmed by the West Virginia Supreme Court of Appeals and were not remanded for further findings of fact and conclusions of law.

Date: 5/15/2018
Certified copies sent to: PA
___ counsel of record
☒ other Defendant + Warden
___ parties
     (please indicate)
By: _____
___ certified/1st class mail
___ fax
☒ hand delivery
___ interdepartmental
_____
Deputy Circuit Clerk

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, SS
I, CATHY S. GATSON, CLERK OF CIRCUIT COURT OF SAID COUNTY
AND IN SAID STATE, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE COPY FROM THE RECORDS OF SAID COURT. 15th
GIVEN UNDER MY HAND AND SEAL OF SAID COURT THIS ____
DAY _____
_____ CLERK
CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA